May it please the Court, Josh Rosenkranz for Dish Network. I'd like to reserve two minutes for rebuttal, if I may. Your Honor, as this case boils down to a simple question, can Congress require a private party to grant preferential treatment to the government-endorsed station and give it an extra channel because the government prefers the content, the subject matter, of that station to other stations? There is no dispute about three facts that are central to this case. The first is that every station wants to be carried in HD. The second is, in order to carry a station in HD, Dish has to add another channel. And third, Dish does not have the capacity to carry every local station in HD. Not even close. Dish carries only one out of five local stations in HD. There are 1,700 local stations that Dish is not carrying in HD. Mr. Rosenkranz, can you help me with the technical capacity problem? As I understand it, Congress has now set out a timetable by which, at the end of the period, all public television stations must be carried in HD. Is there any change that will occur in the capacity to do that? Or is it just going to mean that Dish is going to have to bump other potential HD customers' channels? Well, so let me just be clear. The HD rollout is not for public television stations. It is for all local stations. Okay. I'm sorry. Thank you for answering my question. So the answer to the question on the technical issues is, it's actually not clear in the record, but I actually know the answer. Yes. The answer is that Dish, through a combination of launching new satellites, or a new satellite, these are half-a-billion-dollar ventures, compression technology, which we are gambling on being able to meet, and possibly having to drop some national stations, Dish will try to comply with this requirement, if the requirement is upheld, which is a separate question and cannot be assumed. Now, I was just saying, Dish, because it doesn't have the capacity to make every station a new channel in HD, it needs to make nuanced editorial judgments as to who will get that treatment. And Dish makes those judgments based upon its own preferences of what it thinks its customers ought to want to see, and its customers' preferences. It knows that its customers are less interested in seeing Elmo on HD than they are in seeing the Super Bowl or Avatar on HD. So the government comes in, Congress comes in, and says, we don't care what Dish prefers or what Dish's customers prefer. We're going to override that. Why? Because Congress believes that people ought to be watching more PBS, and the way to make them watch more PBS is if you make it more attractive to them. Now, Your Honors, this is an unprecedented statute. Never has Congress or the FCC ever granted a preference to the government-funded, government-endorsed speaker over everyone else. On the merits, then, this case really boils down, as many First Amendment cases do, to its question of standard of review. And we get to a heightened level of scrutiny, whether it's intermediate or strict, in either of two ways. The first is just the baseline for satellite carriage. Satellite broadcasting is entitled to the same First Amendment protection as its arch-rival cable for content neutral. Is that true, given the more restrictive availability of capacity? I mean, you basically have been given an oligopoly here, along with DirecTV, of a very limited resource, which the government controls through the FCC. And it has issued licenses. And the Supreme Court has said that the government can condition, for public convenience and necessity, and put restrictions on those licenses. Why shouldn't we just treat this as yet another congressional restriction that goes along with the license that Dish has been given? Well, Your Honor, so two answers. First, on the red lion question, Turner answers that. I mean, cable companies have limited space as well. Cable companies But there's a lot more fiber optic capacity than there is. Oh, absolutely not, Your Honor. Cable companies, there's only one right-of-way that you can run these cables on. And in most communities, there's one cable company, precisely because you can't – I mean, the ground is the limit when it comes to cable. The sky is the limit when it comes to satellite. But the Supreme Court in Turner explained to us why red lion doesn't apply to cable, and it's because in – back then, well, gee, cable can carry three dozen or four dozen channels, so there's not the scarcity of viewpoints. Well, satellite can carry 600 channels. But I also want to emphasize the reason that we are outside of red lion anyway is because red lion applies only to the content-neutral regulation. This is a – But haven't the same compression technologies that you were talking about also helped the cable problem? They can carry a lot more channels now than they did. Yes, Your Honor. And cable is subject to intermediate scrutiny. We're just comparing ourselves to cable. They have the same capacity as we do. I'm just saying back in the Turner days, it was only three dozen or four dozen.  Now they have six dozen. But I think the most important legal point here is that this is a content-based restriction. So even if the baseline were red lion, League of Women Voters tells us you bump it up a level to intermediate scrutiny. Well, it's content-neutral in the sense – I mean, it's not content-neutral in the sense that they are singling out non-commercial educational television. It is content-neutral in the sense that they don't have any say-so in the programming per se. Isn't that right? Your Honor, I would quibble with your definition of content-neutral. Content, the Supreme Court and this Court, and Bullfrog in particular, which the government doesn't even cite, has made clear that content neutrality is not about whether the government dictates what you're carrying. I mean, in Arkansas Writers, the government didn't dictate what the newspapers were carrying, but the government elevated, gave a preference, a tax preference, to magazines with certain subject matters. In Bullfrog, the people wanting to import films, the government was not dictating what those were. But they're not licensees. Well, League of Women Voters tells us, Your Honor, that the fact that they are licensees does not diminish the First Amendment protection. If it's a content-based restriction, then it cannot be imposed by way of license. Well, I mean, the FCC can tell broadcasters they have to have a certain amount of public affairs programming, can't they? That's not, I mean, it's content-neutral in the sense that no one tells them what they have to say on the show, but, I mean, it does dictate that they have to have a certain amount of public affairs, a certain amount of, you know, they can't broadcast a certain kind of programming before a certain hour of the day and things like that. Well, Your Honor, I just, I really need to emphasize that when you go back to Bullfrog and Arkansas Writers and Discovery Network, the criterion on which the Supreme Court judges whether something is content-based or not is, do you have to look at the content, the subject matter, or the speaker, to figure out whether the preference is granted? And here, the only way to figure out whether the preference is granted is to ask the question, is this a government grantee? Yes. Is the station carrying sufficient amounts of educational programming? Yes. But is it too much political? Is it too much religious? By the way, if you wanted to draft a statute that most clashed with Bullfrog, it would be this statute, because those were exactly the criteria for granting the benefit or denying the benefit in Bullfrog. But this one is so much worse because this applies only to government grantees. Let me ask a question that's going to influence how I go in my analysis, and it's fair to tell you about it now. We're guided by winter as to how we view this. In order to get by the winter test, you have to show all four of the issues. As I read the record, the district court decided on one issue, and that's fair, too, because you have a burden on all four, and that was likelihood of success on the merits. Not will succeed, but likelihood. So our test here is much broader than it would be after the case has a final permanent injunction. So what I'd like to find out from you in thinking in likelihood of why the district court was wrong, I read what he said, and it didn't help me that much, but couldn't he say within the view of the district court that it's likely you're going to lose this? Can you argue to us that absolutely, when you go back, it's not likely. You will win this case. Is that your burden? And if so, how do you show it? Well, Your Honor, the burden is based upon the evidence currently in the record. Is there a likelihood that we will win? And by the way, I just want to emphasize, this Court decided Klein after winter, and Klein very fully explains in the First Amendment context that the answer to this Court's question. But let me just answer it more directly. Well, let me just say that I have some doubt that we can overrule the Supreme Court. So for that reason, I think winter applies. But you can argue the Klein basis if you want to, the Court, but I'd just say for one-third of the Court, I'd like to know about winter. Fair enough, Your Honor. So let me address the question directly. The facts that form the basis of our legal argument will not change when we go back to the district court. I mean, there's a reason that the government didn't put in any evidence, and it's because those three things that I started with, the three facts that I started with, are undisputed. And as long as this case is about Congress promoting a certain subject matter, and as long as this is a case about a television carrier which is entitled to First Amendment rights, and as long as there are judgments being made about channel capacity, Turner controls this case, and Turner defines content neutrality in a way that I think is very powerful for us. I understand your argument, but if you really believe that, I don't know why you didn't stipulate to a permanent injunction so we could sit it on a fair level the way it is now. Likelihood is far different. We said in sports forum that you should go ahead and try your lawsuit. This is the preliminaries. You didn't. You entered into a stipulation that nothing was going to happen in a district court. I just wondered, there's a — we have to have a lesser — lesser standard at this level than we would afterwards, and I don't know how that balances out in your argument. So, Your Honor, again, I think this Court's opinion in Kline answers that. When you're talking about a First Amendment case and you're discussing only the merits, I mean, there's a reason that the district court looked only at the merits. There's a reason that the government did not put any evidence in. It's because the merits are what's going to control this case. The Supreme Court did this in Velazquez as well. This Court did it in Kline, in San Martino. It is very, very common to litigate First Amendment records because — excuse me, First Amendment cases on bare records of a preliminary injunction because what's going on here, Your Honor, is a clash between the government and us on fundamental First Amendment principles. I mean, either Redline applies or Turner applies. Either this is content-neutral or it's content-based. The facts on the ground are not going to drastically change the answer to those questions. I see my two minutes are just about to expire, so if I may, unless the Court has questions. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honors. I'm Mark Stern for the government. I'm happy to begin either with the irreparable injury end of things or with the merits. I think on both, there's been virtually no argument presented here on irreparable injury. With the Court's permission, I'd just like to briefly talk about that and put this into context. Whatever you like. What we have here is, remember, there are FCC regulations that are the background to this case that are requiring that all HD, that DISH and DirecTV, which is already carrying PBS everywhere, by the way, so it's really, at this point, DISH, carry one, carry all in HD for every market in which DISH is offering HD. That's going to be fully effectuated by 2013. There's also an alternative means where you don't even come within any of the congressional timetable, which all the congressional timetable does is to accelerate the FCC timetable for PBS stations essentially within a two-year period. That's the sum of the unprecedented first time. In 2013, all local stations will be in HD? Oh, yes. Oh, yeah. No, that's what we're talking about. I mean, I think notwithstanding my friend's rhetoric, I think that what we're talking about is not one of the more unprecedented regulations trying to protect public television. So that's what we're talking about. Now, we also have, in addition to the timetable, which, by the way, the second phase of which would now kick in in February of this year for public television, is the alternative means where it doesn't apply to your alternative means of compliance if you enter into a contract indicating that you're going to carry, that you're carrying at least 30 public television stations. Now, that some dish did that shortly before the preliminary injunction in this case issued. So at this point, what we have is a contract that covers 30 stations. All of the allegations of dish harm really went to such as they are, and we disagree with those, but those went to complying with the statutory timetable, not with the 30-station contract. Now, under the FCC regs, the second phase of which are going to go into effect next month, I believe we're already up to something like 30 or 40. I've got it written down here. But some percentage of the overall number of stations where there's going to have to just be, you know, carry one, carry all, everybody in that market gets HD. I believe based on our calculation based on the dish numbers is that that's going to put them like over 30 stations right there, just under the FCC regs, which they're not challenging. So what we have here at this point is a contract, 30 stations, FCC regs requiring probably more than 30 stations. That's the current status quo that we have in this world. Now, when dish brought this, they sought an injunction against enforcement of the statute. There is clearly not going to be any enforcement because they're already in compliance. In effect, what they're asking for at this point is a declaratory judgment that says the statute is void, therefore I can exercise, if I want to, I can exercise my option under this contract to get out of the contract, because they put into the contract a statement saying that they could do that if the statute were declared unconstitutional. Now, I'm not arguing that the case is moot. You're right. I'm not arguing that it's moot. But I am arguing about what the standards for a preliminary injunction. I see. So you're saying that there really is no significant irreparable harm here because in a very short period of time they're going to be carrying everybody anyway. That's part of it. And part of it is even right now. The allegations have to be parsed through very carefully about what the harm is. It is not even clear that they would get out of this contract if the court were to – and remember, they are asking this court to strike down a Federal statute, which is a fairly serious matter. It is not even clear that they would actually get out of this contract voluntarily if the statute disappeared tomorrow, because the FCC regs are still there. They're going to have to comply with the FCC regs, which are already sort of about to go, as I said, into their second phase in February. They're going to have to comply with that. And it's not even clear that it would be in their advantage to get out of this contract, you know, if, you know, if they, you know, if they had the opportunity to do so. But that's the irreparable harm. Does the – let me make sure I understand your argument. Does the current contract that they've entered into forever excuse them from the obligation to meet the 2013 timetable? The 2013 is the FCC timetable. By 2013 – I mean, we've got two sort of separate but related things going on. The FCC, in regulations that are not challenged, says, you know, carry one, carry all, means that you carry it in the same format. And by 2013, any market in which you're carrying HD for one station, you have to do it for all stations in that market. So by 2013, this statute adds nothing to anything, right? So – and in the meantime – So the only practical effect is that it just moves into newer markets where they're not currently carrying local stations and there is a public television station in that market. They will have to carry it in HD once they've made the decision to expand their coverage. Yes, so right now, because they – look, they basically don't have to worry about – as long as they've got – signed this contract, they don't have to worry about the congressional timetable for PBS. I understand. But as a practical matter, if they move into a market that they don't currently serve, and I can't tell from the record which they do and which they don't, they would have to carry – Well, they will by 2013. But that's a function of the FCC reg, which isn't before the court. And even though there are murmurings in the brief about this being of dubious constitutionality, the time period for challenging those regs has passed. The FCC adopted the regs on the basis of a joint proposal from DISH and DirecTV, and a challenge to the regs would be totally baseless anyway. But I would add that so is the challenge to the statute. I mean, in cases like Klein, the court of appeals, this court, struck down – just essentially held, look, this statute is just invalid. Yes, we're here on a P.I., but it's clear there's nothing more to do, and it's invalid. But DISH invites this court to reach the same conclusion with regard to this statute. That is – even though it's characterized as being governed by settled law, all the cases are to the contrary. It wasn't the case that got mentioned that actually involved a court striking down a restriction, including Turner and including the cases that aren't mentioned, which would include the D.C. Circuit's decision in Time Warner, which has been around for a fair amount of time now. I think it's 1996 or 7. In the court, the D.C. Circuit in that case says, one, Red Lion applies. Two, they were reviewing something that's far more significant than this moderate sort of tinkering with a timetable for H.D. There, there was a requirement that satellite carriers set aside between 4% and 7% of their capacity for educational television. The D.C. Circuit, looking to Turner, says, look, this is just one more instance in the longstanding congressional policy of supporting educational television. They found no problem with that whatsoever. And, indeed, sort of going back, I think the FCC v. League of Women Voters case sort of points out that going back to like the late 40s, there have been set-asides for public television because Congress has always recognized that public television, just as my friend cogently explained, like in the market, isn't going to do very well. You know, everybody understands that. There's no doubt about that. That's what underlies all the protections that were afforded. And they were afforded in Turner, where the court looks at those protections that were given for, you know, qualified stations, a definition that is essentially the same PBS stations that are involved here. The court goes, this is content neutral. And it looks at and it says, look, if we had a situation in which the government was really able to control the speech of these stations, that might be worrying. But it cites all the reasons why, in fact, the whole PBS structure has been set up to minimize government ability to regulate its content and why, in fact, all of the requirements are set up to avoid being captured by any special interest. That's the Supreme Court in Turner saying it's not sort of, you know, it's not a content-based. It's content neutral. I mean, you know, and we've got the Fourth Circuit in severe case saying, look, I know what you'd rather do, which is the first case upholding the carry-one, carry-all policy generally, saying, look, I know you'd rather carry more lucrative stations, but Congress can protect, sort of, you know, can ensure a diversity of opinion, you know, an availability of these stations, you know, too bad. And the Supreme Court said that and so did the D.C. Circuit specifically about public television ensuring the diversity of viewpoints. There is nothing new about this whatsoever. Would you entertain a question? Sorry, Your Honor. This is a procedural question. I've looked, I've tried to start with what the district court did. The district court at the end invited the government to draft an order, and the order doesn't give me an awful lot of help either because it says based on the entire record before the court, the argument of the parties and the reasons stated on the bench, that doesn't tell me what argument of the parties or anything, but I did read what he had to say, and it comes closest to be, it seems to me, whether there's a likelihood of success on the merits, the number one issue. Suppose we decide that he was wrong or that there was an insufficient record for him to make the decision, whatever. Do we then send it back to the district court to consider the other three factors or do we just grant the preliminary injunction? Well, I mean, this Court, I think, just as a purely technical matter, does have a lot of discretion. I mean, there are cases in which a court can hear a P.I. and, Mr. Kranz rightly says, look, it's not barred from saying, no, the statute, you know, is unconstitutional. I don't have to do more than that, ends the inquiry. I mean, I don't think that's outside of something that the court could do, you know, but, you know, if there are unless the court really looks at this and goes, wow, this is totally unconstitutional. I mean, we do have a situation here in which after the sort of shortly before the district court's issue denied the P.I., this contract was entered into. Subsequently, we did also have the district court denying a motion for an injunction pending appeal and this Court denying a motion for an injunction pending appeal. I know, I understand all that, but you haven't answered my question. I mean, you wrote the order, your side wrote the order. Yes, Your Honor. Your side could have written the order covering all four issues. Yes, Your Honor. Because it was certainly general comment. And if the judge signed it, you're home free. He signs one, suppose we disagree with that one. But there's some merit to the other three, and we want to know, do then we just grant the temporary injunction, or do we send it back for findings on the areas that your order did not cover? I think, Your Honor, that to the extent that there is any ambiguity about this, that the proper course is to leave this injunction, is to not – is to just leave things as they are and to remand to the district court to hear any further proceedings based either on arguments on merits or on questions of irreparable harm. See, that's the problem. You entered into a stipulation that nothing was going on. This case could have been decided on a permanent injunction by now. Well, Your Honor, we didn't. I mean, we don't have the moving party. In our court's forum, we've cautioned you not to do that. But we're not the moving party, and we didn't stipulate anything. We – like the Court says, draft an order, we drafted an order. We don't have to draft an order saying that there's a – that the Court loses finally. I mean, we come in, we oppose like a TRO and a PI. This wasn't our case. It was their case. They bore the burden at every step of the way. They bear the burden now. I submit that they have not met the burden on the issue of irreparable harm. They certainly haven't met their burden on the merits. Okay. Now, I understand that irreparable harm is one that could have been decided but wasn't decided. Well, I think it was at least a very simple one. Suppose, hypothetically, we decide the district court was wrong on whether there's a likely probability that they will not prevail. There are three other issues the district court did not govern. Do we just grant the preliminary injunction, or do we send it back for findings on the other three? We certainly can't make the findings here. No, and in the absence of any evidence that the Court overlooked, I mean, the Court does, like it would be good if the Court had in its discussion from the bench spelled out everything. I don't think that there's any basis for assuming that the Court didn't know the overall framework that it was ruling on, and there is no – I mean, the Court could look at the evidence, you know, before it about whether there is irreparable harm, but if there's none, to assume that the district court erred in its assessment of the irreparable harm because it didn't talk about it, I think can't possibly provide a basis for reversing it. I mean, there really would have to be something in this record in which Dish bears the burden of proof. I read the district court opinion from the bench, and there's precious little there. I read the record that was authored by the government. There's precious little there. But this is – but the burden here is on Dish. And after all the briefing in this case, the contract was entered into. And then there is additional briefing before this Court on the issue of the injunction pending appeal request. So there was further briefing after that that was presented in which, unless my memory is failing me, we certainly addressed the issue of irreparable harm as one reason for the Court to deny it. I did not see that. I'm frank to admit I may have missed it. I read everything the district court said, and I certainly read the order the government directed. And if it's in there, it's described. This would have been a post. There was an injunction. And I don't want to overstate things because I can't sort of see the papers in front of me, but this would have been after the P.I. Order, we then had the briefing on a request first made in district court and then to the court of appeals on the issue of getting an injunction pending appeal. But again, you know, the – you know, the district court was acting on an accelerated time frame, and if it didn't say something, the question is still what is in the record? Would there be a basis for finding irreparable harm on the basis that we have now? The question is whether or not the district court made a finding of irreparable harm. We don't make findings up here. We review them. No. I mean, I think – I understand what Your Honor is saying, and I certainly agree with the issue of findings. What I also think, though, is that in determining whether the district court abused its discretion, one also looks at the record to see what was before the court and if there were significant matters regarding harm that the court, like, would have warranted a different outcome, and that's clearly not the case. But I really would emphasize that on the merits, this fails at every stage and under – you know, again, you know, under the intermediate scrutiny standard, which, you know, we've briefed, you know, like, you know, this clearly survives scrutiny under any conceivably applicable standard. You've answered the question. Thank you. Thank you. Appreciate it. Your Honor, let me start with the procedural issues. First, the government keeps calling this a safe harbor. There is no safe harbor here. We are required to carry 30 new stations that we would not have carried but for the existence of STELA. The notion of calling that a voluntary contract or – I mean, but it's not by statute, right? It's by contract. Your argument is they put a gun to our head in the form of the statute and we would never have entered into this contract but for the statute. Yes, Your Honor. And if that is a device Congress is allowed to use to get around First Amendment violations, it can do it freely then. In PG&E, the legislature or the utility commission can say, here's the deal. Every envelope needs to carry other people's material, but if you voluntarily agree, only half the envelopes. American Trucking says that doesn't work, this Court's opinion. Every day of forced carriage of those 30 stations is a constitutional violation. And I – and the existence of the HD rollout going forward doesn't change it. It's a different 30 stations. Those 30 stations are set in stone. We got what they – what we could to – the stations we could to sign this agreement and they are the ones we have to carry. The rollout will apply to completely different stations. On the timetable – Let's – let me stop you there. If we were to agree and strike down the statute, would the general FCC regulations fall as well? No, Your Honor. The FCC regulations will stand or fall on their own merits if and when we end up challenging them on a constitutional ground. But this Court does not need – it is not – the FCC regulations are not before this Court. Right. So they are – You would then have to meet, would you not? The timetable set out in the regulation. Over a three-year period from the passage of the statute. But there is no case that has ever said that a First Amendment violation is forgivable just because it will expire in three years from the date of passage. And that's what we're talking about. It's three years from 2010, when this law was passed, that that rollout would equalize everyone up to the PBS level. Now, if I may, Your Honor, I just want to address a merits point. I'm sorry, Judge Tallman. No, I'm just – I'm just thinking about your answer. I'll have to think about it. Go ahead. Think of all of the Supreme Court cases and this Court's cases and ask yourself if there was a difference between two sets of speakers, but that difference was going to expire when group was going to be brought up to the other level in three years, would it still have been a constitutional violation? Well, I've got to tell you, what really sticks in my craw is I'm having a hard time getting my mind around the idea that this is a real First Amendment, a real major First Amendment problem, telling your client he's going to have to carry PBS and HD instead of SD as it does now 18 months sooner than it ordinarily would. Well, Your Honor, not instead of SD. In addition to SD, so for that 18-month period. Grant, I just have a hard time seeing that as a real serious First Amendment issue. Well, Your Honor, the question is whether it's a First Amendment violation. This is a content-based regulation. And Time Warner, excuse me, this, the Supreme Court's opinion in Turner explains exactly why it's a content. But if it's not a First Amendment violation to set aside 4 to 7 percent of your capacity in order to carry public television stations, we're really arguing about the transmission quality of the stations that you're otherwise already obligated to carry, aren't we? No, Your Honor. First of all, I would disagree with the premise. The D.C. Circuit upheld that regulation, the 4 to 7 percent, on a red-lion standard. It was very controversial when the D.C. Circuit adopted it. Five judges, one short of the majority, needed to grant rehearing on bonk dissented. And today, there is no way today's Supreme Court would ever, it is told us in Bolger, would ever extend red-lion to a new medium. But I also want to underscore, that was a totally different regulation. 4 to 7 percent was not for qualified educational programs defined the way this statute was. It said you've got to be diverse. And in order to be diverse, you network, excuse me, TV carrier, are always in the driver's seat. You get to decide how you're satisfying the educational component. Here, Congress is saying this is about having to carry Congress's preferred station. It's not just educational. It is PBS that Congress has specified by this definition. And government-funded stations in particular, that is vastly different from Time Warner. Thank you, Your Honor. Roberts. You want to finish your thought here? Finish your thought if you, sounds like you have. Yes. Thank you, Your Honor. Thank you. Thank you. Thank you, too. The case just argued is submitted. We'll stand in recess for today. Good argument. All rise. The case is submitted.
judges: Wallace, Silverman, Tallman